BALTIMORE & OHIO RAILROAD CO. (CELANESE CORPORATION OF AMERICA) *v.* UNITED STATES (No. 3840)[1]

United States Court of Customs and Patent Appeals, March 4, 1935

*Blackman, Pratt & King* (*Addison S. Pratt* of counsel) for appellant.
*Joseph R. Jackson*, Assistant Attorney General (*Ralph Folks*, special attorney, of counsel), for the United States.

[Oral argument February 5, 1935, by Mr. Pratt and Mr. Folks]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

The Celanese Corporation of America imported at the port of Baltimore, Md., certain parts of machines known as jet holders and nozzle caps or blank jets which are more particularly hereinafter

---

[1] T. D. 47586.

described. The collector classified the same under paragraph 372, Tariff Act of 1922, under the provision for "all other textile machinery or parts thereof, finished or unfinished, not specially provided for" and assessed the same with duty at 35 per centum ad valorem. The Baltimore & Ohio Railroad Co., for the importer, protested the said classification and assessment with duty and claimed the same dutiable under the same paragraph as chemical machinery or parts thereof at 30 per centum ad valorem. The United States Customs Court overruled said protest and affirmed the decision of the collector, and appeal from its judgment has been taken to this court.

PAR. 372. * * * knitting, braiding, lace braiding, and insulating machines, and all other similar textile machinery or parts thereof, finished or unfinished, not specially provided for, 40 per centum ad valorem; all other textile machinery or parts thereof, finished or unfinished, not specially provided for, 35 per centum ad valorem; * * * all other machines or parts thereof, finished or unfinished, not specially provided for, 30 per centum ad valorem * * *

The jet holders are pieces of metal about 4 or 5 inches high and between 1 and 2 inches in diameter. The blank jets or nozzle caps are circular pieces of metal stamped in the shape of a cup and are, after importation, perforated with from 10 to 52 very small holes. The jets are attached to the holders, and are used in making artificial silk filaments, and have no other use. Cellulose acetate is dissolved in various solvents and is treated so as to form a viscous fluid which is forced through the small holes in the jets by means of pumps. The fluid drops down, in the form of liquid strands, into a chemical where the solvents are evaporated, leaving very fine filaments. Any number of these filaments, from 9 or 10 up to 106, may be twisted together to form a thread which is known as an artificial silk thread and which is woven and knitted into fabrics and also is used for insulation of electrical apparatus. The filaments as they come from the jets are so fine that they cannot be used in that condition for weaving, but after a number of them are twisted together they are suitable for that purpose.

It is the contention of the importer that because the jets and holders do not operate to make a textile thread which can be woven, the importation does not respond to the term of textile machinery. We quote from appellant's brief:

1. A machine, in order to be classified as a textile machine, must be used in operating upon, processing, manipulating or otherwise treating textile fibres or fabrics.

2. But, if a machine operates upon, processes, manipulates or otherwise treats textile fibre or a textile fabric, it is not to be classified as a textile machine, if the product is not a textile product, a textile material.

We cannot agree with the contention of appellant and think that the decision of the case at bar is clearly ruled by certain carefully considered decisions of this court.

In *Jett & Co.* v. *United States*, 18 C. C. P. A. (Customs) 86, T. D. 44044, certain tanks and machines which were used in the advancement of chemically treated cotton linters to the state of artificial silk threads, but all of which machinery was used prior to the point where any thread emerged from the operation, were held to be textile machinery, under the paragraph now under consideration. Appellant's contentions there were quite similar to appellant's contentions in this case. We there said:

Appellant contends that the machines in issue are used in creating fibers, by chemical methods, and that after such artificial fibers are produced, other machines operate upon those fibers to fabricate them into yarn, and inasmuch as no textile fiber is in existence at the point where the machines in issue have completed their work they can not be held to be textile machinery.

\* \* \* \* \* \* \*

\* \* \* the machines in issue are clearly textile machinery. They are used exclusively in the manufacture of artificial silk, which is of course a textile material. The process performed by each of the machines is essential in the manufacture of such material. In our opinion it is wholly immaterial that the processes resulted in the creation of a new fiber. The raw material utilized in the beginning is a textile fiber. The manufactured article, the result of a large number of processes between the raw textile fiber and the finished product, is artificial silk yarn. Thus the manufacturing processes begin by utilizing a textile fiber and end with an artificial silk yarn. It is immaterial whether in such processes the original fiber has been destroyed and a new fiber created. It is likewise immaterial that the machines in question do not perform all of the manufacturing processes necessary in the production of the yarn. All of them are used in its manufacture. The manufacture of the yarn begins with one of the machines in question and the sole end of the processes employed is the production of artificial silk yarn.

Appellant seeks to distinguish the case at bar from the *Jett & Co.* case, by pointing out that the importer is the manufacturer of cellulose acetate which it disposes of in some instances without manufacturing into thread; that the imported articles are concerned only with the processing or manipulation of cellulose acetate; and that the processing of cotton linter fibers is not involved.

In this case, as in the *Jett & Co.* case, the articles are used exclusively in the production of artificial silk yarn. It is unimportant, as far as the issue is here concerned, whether the jets complete the operation and produce a finished weavable thread. Necessarily, the production of artificial silk yarn employs a method involving several steps, and all machinery involved in the process of making textile yarns or threads is textile machinery.

The case of *Passaic Worsted Co. et al.* v. *United States*, 17 C. C. P. A. (Customs) 459, T. D. 43916, involved machines which performed no other function than to clean and dry fleeces. This court held that this operation was merely the cleansing of an article and was not a manufacturing process and that the machines were not textile machines, since they were not used in the manufacture of textile material. This case has no relevancy to the issue at bar.

*Whitlock Cordage Co.* v. *United States*, 13 Ct. Cust. Appls. 656, T. D. 41490, involved breaker cards, drawing frames, and spinning frames as well as a "24 spindle patented twister". The first three articles were used in the manufacture of yarn, which the court said was a textile material, and were, therefore, textile machinery; the twister was used in twisting yarn into strands and the strands into rope. Its function was to manufacture a textile material into a product which was not a textile. The twister was, therefore, held not to be textile machinery.

We think our holding in the *Whitlock Cordage Co.* case is applicable to the case at bar. We there said:

It will be noted that the provision for "all other textile machinery or parts thereof, finished or unfinished, not specially provided for," in paragraph 372, *supra*, immediately follows the provision for "knitting, braiding, lace braiding, and insulating machines, and all other *similar textile machinery* or parts thereof." (Italics ours.)

Obviously, the provision was not intended to be limited in its operation to textile machinery of any particular kind, or to that which produced woven fabrics. It was intended, we think, to be sufficiently comprehensive to cover *all* textile machinery not otherwise specially provided for, and certainly includes machines which are used in the manufacture of textile materials.

In *United States* v. *Schenkers, Inc.*, 17 C. C. P. A. (Customs) 231, T. D. 43669, copper rolls intended. when properly engraved, to be used in printing or stamping designs on silk cloth, were held to be parts of textile machinery.

For the reasons aforesaid and upon the authority of the herein cited cases, the judgment of the United States Customs Court is *affirmed.*